IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) RAMIRO RAMIREZ, an individual,
 Plaintiff,

v.

(1) KAY COUNTY JUSTICE
FACILITES AUTHORITY d/b/a
KAY COUNTY DETENTION
CENTER, a public trust,

(2) TURN KEY HEALTH CLINICS,
LLC, a Domestic Limited Liability
Corporation,

(3) CALLIE GRAY, individually,

(4) JOSEPHINE OTOO, individually,

(5) DON JONES, individually and in
his official capacity as Director of
the Kay County Detention Center,
and

(6) JOHN, JOE & SERGEANT DOE,
individually, as yet unidentified
Detention Officers.

 Defendants.

Case No. CIV-21-971-JD

JURY TRIAL DEMANDED
ATTORNEY LIEN
CLAIMED

## COMPLAINT

COMES NOW the Plaintiff, Ramiro Ramirez, an individual, and for his

causes of action against the above-named Defendants, alleges and states the

following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Ramiro Ramirez ("Ramirez"), is a resident of Noble County, state of

Oklahoma. Plaintiff was, at times pertinent hereto, a detainee in the custody of the Kay County Detention Center;

2.     Defendant Kay County Justice Facilities Authority, d/b/a Kay County Detention Center ("KCDC"), is a public trust created and operated for the benefit of Kay County, state of Oklahoma, and Kay County Board of County Commissioners. Kay County Justice Facilities Authority is and, at all pertinent times herein, was responsible for the establishment, development, operation and regulation of the KCDC in Kay County, state of Oklahoma, at all times pertinent hereto, along with the employment and supervision of Detention Officers, Jailers, persons working, employed and contracted to work at the KCDC. Additionally, this Defendant was responsible, in part, for creating and implementing policies, practices, customs and protocols that govern the provision of medical and mental health care to inmates at KCDC, and for training and supervising its employees, with the exception of those policies and practices delegated by contract to a medical services provider;

3.     KCDC had a non-delegable duty to provide all persons detained at the KCDC with adequate medical care and require appropriate training for jailers in accordance with standards promulgated by the State Department of Health. 19 O.S. §§ 513.1 and 513.2;

4.     Defendant Turn Key Health Clinics, LLC ("Turn Key") is a domestic for-profit Limited Liability Company doing business in Kay County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties,

including KCDC, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times material hereto responsible, in part, for providing medical services, supervision and medication to Ramirez while he was in custody of the KCDC. Turn Key was additionally responsible, in part, under contract with KCDC, for devising, reviewing, revising, implementing and having policies and procedures available on KCDC site, that govern the provision of medical and mental health care to inmates at KCDC, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Kay County Justice Facilities Authority, d/b/a Kay County Detention Center, with powers and/or functions governmental in nature, such that Turn Key was acting under color of state law of liability under 42 U.S.C. § 1983;

5. Turn Key was the correctional medical provider at KCDC at all times material herein and contracted to provide 100% of the medical services at KCDC to inmates, including Ramirez, during all times material herein;

6. Under contract to provide 100% of the medical services at KCDC, Turn Key was either a final policymaker with respect to all medical services, or alternatively, Turn Key was the authorized decisionmaker with final policymaking authority;

7. Turn Key's contract to provide correctional medical services at KCDC characterized it as, and created its relationship to KCDC, as that of an Independent Contractor;

8.    The Oklahoma Governmental Tort Claims Act ("OGTCA") explicitly excludes independent contractors from its immunity provisions. 51 O.S. §152(7)(a)(1);

9.    Turn Key waived any and all potential state law immunity that might be available under the OGTCA by contracting with KCDC as an independent contractor;

10.    Callie Gray and Josephine Otoo were at all times material herein agents or employees of Turn Key and/or KCDC, who were, in part, responsible to provide medical and mental health services at KCDC to inmates, including Ramirez, and responsible for overseeing Ramirez's health and well-being, including meeting Ramirez's medical and mental health needs during the time he was in KCDC custody. At all times material hereto, Callie Gray and Josephine Otoo had first-hand knowledge and saw Rmirez's condition(s) and complained of herein and were acting within the scope of their employment and under of color of law. These Defendants are sued in their individual capacity;

11.    Defendant Don Jones ("Jones") was, at all times pertinent herein, the Jail Director of KCDC and, as such, responsible herein individually and in his official capacity as an authorized decision maker for the operation of KCDC and the employment, training and supervision of its employees, Detention Officers and contractors. In his capacity as Director, and to the extent KCDC was not the final policymaker, Jones was a policymaker for training and operational aspects of KCDC and implementation of all KCDC policies, with

4

the exception of those policies and practices delegated by contract to a medical services provider. Jones, as on-site Jail Director, created, promulgated, implemented and/or possessed responsibility for the operation of policies, customs or practices at KCDC which subjected Ramirez to unnecessary and dangerous delays in the provision of adequate medical care required for a serious condition that caused pain and physical injury. Further, during the course of events Ramirez complains of herein, Jones became personally aware of his medical circumstances, the failure and/or delay in provision of adequate medical care and subsequently contacted Ramirez to apologize for not acting to assist or help Ramirez while incarcerated at KCDC;

12.    John Doe, Joe Doe and Sergeant Doe, were KCDC Detention Officers and/or jail staff pertinent to the facts of this case, as referenced herein, and at all times material hereto acting under color of state law and were either employees and/or agents of Defendant Turn Key and/or the KCDC and sued herein in their individual capacities. Further, Defendant Sergeant Doe, was acting as a supervisor at all times material herein and, as such, created, promulgated, implemented and/or possessed responsibility for the operation of policies, customs or practices at KCDC which subjected Ramirez to unnecessary and dangerous delays in the provision of adequate medical care required for a serious condition that caused pain and physical injury. In addition, as set forth in allegations below, Sergeant Doe had direct knowledge and saw first-hand Ramirez's serious medical condition and directly heard his

complaints. Ramirez previously sought the identifying information for John, Joe and Sergeant Doe via an Open Records Act request, 51 O.S. § 24A.1 *et seq.*, on March 29, 2021, and KCDC <u>denied</u> this request for identifying information on April 5, 2021. Thus, these Defendants' identifying information is not yet known but will be sought after in discovery and supplemented as per the Court's Scheduling Order. (See Exhibit "1");

13.     Pursuant to 51 O.S. § 156 and Title 57, Ramirez's counsel provided notice to Turn Key and KCDC of the claims herein. No Defendants responded to said notice and the same was deemed denied by operation of law pursuant to 51 O.S. § 157. (Exhibit "2");

14.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eight and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C.§ 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law;

15.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

16.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, the claims form part of the same case or controversy arising under the United States Constitution and federal law;

17.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this U.S. District;

**STATEMENT OF FACTS**

18.   Paragraphs 1-17 are incorporated herein by reference.  In summary, while an inmate in the custody of KCDC, Ramirez suffered a cerebral vascular incident ("CVI", "CVA" or "stroke"), complained of pain and obvious "stroke" physical symptoms to Detention Officers/jail guards, Detention Sergeant and Turn Key medical employees, on duty during the relevant dates and times detailedbelow, on multiple occasions requesting appropriate medical attention.  Upon intake into the jail, at the very least, KCDC was aware that Ramirez was an insulin dependent diabetic with a history of heart attack and stents. During the hours critical to Ramirez's verbal complaints of pain, "stroke" symptoms and pleas for medical attention, Defendants viewed his physical condition and recorded high and dangerously high Glucose and Blood Pressure levels. Ramirez's pleas for help and medical attention were done directly to KCDC Detention Officers on duty during "rounds" at his jail cell, to a Detention Sergeant and via Intercom pursuant to the "sick call" process. Despite his history of *diabetes, insulin dependency, dangerously high Blood Pressure and Glucose levels* and obvious physical signs and complaints of "stroke", including pain, *weakness on his left side*, inability to walk or sit unassisted, facial droop, Ramirez was ignored and ridiculed by

Detention Officers/jail guards for hours at time critical junctures and when finally seen by Turn Key medical staff at KCDC was not properly evaluated, provided adequate medical attention or emergency transport to a hospital, until after about sixteen (16) hours of delay. As a direct result Ramirez suffered temporary and permanent physical disability, pain, suffering, etc.;

19.    On or about October 15, 2020, Ramirez was booked into the KCDC for failure to pay costs and fines on an old case. (Kay County, Oklahoma, CM-2014-00431). For approximately two (2) days Ramirez was placed in a KCDC "Holding Cell". This area was up front adjacent to the receiving/intake area that also served as the nurse/medical station. The Holding Cell had a window looking into the receiving/medical area. Upon initial entry into KCDC Ramirez verbally informed staff and Detention Officers that he was diabetic    and *insulin dependent.* Ramirez    requested from Detention Officers, assigned to the Holding Cell on October 15, 16 and 17, 2020, to see the    nurse    and receive    insulin and    diabetes    medication. During this approximate two (2) day period, in the Holding Cell, Ramirez was not allowed to see a nurse and was not provided insulin or diabetes medication. During this same time, in the Holding Cell, Ramirez complained to Detention Officers, on each Shift for those days, of physical problems such as: not feeling well and blood sugar levels needing to be checked;

20.    On October 17, 2020, at approximately 4:46 p.m., Ramirez was interviewed by Krista Dorscher (KCDC Detention Officer or Turn Key employee) for

an "Intake Screening" process. Among other things, KCDC Intake Screening

record noted:

> a. Ramirez reported past heart attack and stents placement in 2016,
> b. No prior stroke,
> c. Ramirez had diabetes and takes insulin for it,
> d. Ramirez appearance was "unremarkable",
> e. Ramirez behavior was "appropriate",
> f. He was "alert",
> g. His breathing was "unremarkable",
> h. His "ease of movement" was "unremarkable",
> i. He received instruction on "facility's Sick Call process",
> j. "He appeared "stable" and was assigned "General Population". (Complaint Exhibit C.005, .006, .007 and .008)

21. Krista Dorscher noted Ramirez's medical history, including diabetes, insulin

use, and previous heart attack with stents. (Exhibit Complaint Exhibit 3, <u>right</u>

<u>corner</u>, page 1/56 – 6/56);

| 372280 | Intake Screening - Medical | Heart attack/cardiac disease? If yes, when? Explain. | Yes (mi in 2016 2 stents placed ) | Dorscher, Krista | 10-17-2020 4:46 pm |
|---|---|---|---|---|---|
| 372280 | Intake Screening - Medical | High Blood Pressure? Note details. | No | Dorscher, Krista | 10-17-2020 4:46 pm |
| 372280 | Intake Screening - Medical | Cancer/Oncology? Note Type. | No | Dorscher, Krista | 10-17-2020 4:46 pm |
| 372280 | Intake Screening - Medical | Are you currently being treated for lung disease (asthma)? | No | Dorscher, Krista | 10-17-2020 4:46 pm |
| 372280 | Intake Screening - Medical | Stroke? | No | Dorscher, Krista | 10-17-2020 4:46 pm |
| 372280 | Intake Screening - Medical | Diabetes? Do you use Insulin? (Type or Dose) Note Current FSBS Do you consider your diabetes as under good control? | Yes (DM 1 dx 2000 novolog sliding scale and 70/30 at hs fsbs 335) | Dorscher, Krista | 10-17-2020 4:46 pm |

22. Krista Dorscher also      documented on Intake that *Ramirez's*      *behavior*

*was appropriate* and *appearance was unremarkable*. Ramirez did not come

into KCDC with "stroke" symptoms and cooperated with jail staff, informing

them of his medical history and needs (Exhibit Complaint Exhibit 3, <u>right</u>

<u>corner</u>, page 3/56);

| 372280 | Intake Screening - Medical | Mental Health Condition? (Complete Mental Health Intake Screening on every person) | Yes (DX bipolar, anxiety, depression., schizophrenia ) | Dorscher, Krista | 10-17-2020 4:46 pm |
|---|---|---|---|---|---|
| 372280 | Intake Screening - Medical | Appearance | Unremarkable | Dorscher, Krista | 10-17-2020 4:46 pm |
| 372280 | Intake Screening - Medical | Behavior | Appropriate | Dorscher, Krista | 4:46 pm |

23.   KCDC "Medication Administration Records" indicate Ramirez did not begin

receiving insulin (and Buspar) medication until the morning of October 18,

2020.  (Exhibit Complaint Exhibit 3, <u>right corner</u>, page 27/56);

24.   Ramirez was moved to a regular Cell Pod sometime late on October 17

or early October 18, 2020, that was composed of about 16 inmate

cells. Ramirez complained to Detention Officers/jail guards on duty in his Cell

Pod on each shift, October 17, 18, 19, 20 and 21, 2020, of his blood sugar

levels being high, feeling sick and pain. On these dates, KCDC

records memorialized that Ramirez's *Glucose* levels were at: *High, Very High*

*and Dangerously High* levels on a consistent basis. This was especially of

note given Ramirez's documented history of diabetes, insulin dependency,

heart disease and recorded Blood Pressures. However, the same KCDC

records do not indicate any action taken or why Ramirez's levels were so high

if he was being given insulin.  (Exhibit Complaint Exhibit 3, <u>right corner</u>, page

52/56 – 54/56, emphasis added);

| | |
|---|---|
| **Date of Reading** | 10-17-2020 9:26 pm |
| **Glucose Level** | 335 |
| **Action Type** | [blank] |

192 168 100 260/Modules/Chart/history

| | |
|---|---|
| **Date of Reading** | 10-18-2020 6:01 am |
| **Glucose Level** | 237 |
| **Action Type** | [blank] |
| **Medication Name (If PO RX)** | [blank] |
| **Action 2 Type** | [blank] |
| **Medication Name 2 (If PO RX)** | [blank] |
| **Notes** | [blank] |

| | |
|---|---|
| **Date of Reading** | 10-18-2020 6:02 am |
| **Glucose Level** | 237 |
| **Action Type** | [blank] |
| **Medication Name (If PO RX)** | [blank] |
| **Action 2 Type** | [blank] |
| **Medication Name 2 (If PO RX)** | [blank] |
| **Notes** | [blank] |

| | |
|---|---|
| Date of Reading | 10-18-2020 6:33 am |
| Glucose Level | 233 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| | |
|---|---|
| Date of Reading | 10-18-2020 6:16 pm |
| Glucose Level | 353 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| | |
|---|---|
| Date of Reading | 10-18-2020 7:09 pm |
| Glucose Level | 353 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| Date of Reading | 10-20-2020 6:23 am |
|---|---|
| Glucose Level | 204 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| Date of Reading | 10-20-2020 6:13 am |
|---|---|
| Glucose Level | 203 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| Date of Reading | 10-20-2020 7:22 pm |
|---|---|
| Glucose Level | 341 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |
| Medication Name 2 (If PO RX) | [blank] |
| Notes | [blank] |

| Date of Reading | 10-21-2020 7:23 am |
|---|---|
| Glucose Level | 285 |
| Action Type | [blank] |
| Medication Name (If PO RX) | [blank] |
| Action 2 Type | [blank] |

25. On each occasion when Ramirez's <u>Blood Pressure</u> was recorded, at times critical to these allegations on October 20 and 21, 2020, KCDC records memorialized that it was *abnormal* and consistently in ranges that

13

were obviously Hypertension Stage 1, Hypertension Stage 2; and, of special

note, *Hypertension Stage 3 – severe level requiring immediate medical*

*attention by a physician* in the early morning of October 21, 2020 . These

KCDC recordings were a clear sign of a serious medical condition and warning

of serious risk given Ramirez's documented history of diabetes, insulin

dependency, heart disease and recorded Glucose levels. (Exhibits Complaint

Exhibit              3,              page              50/56              &

51/56,emphasisaddedbelow)

| | |
|---|---|
| **Date of Reading** | 10-21-2020 2:34 am |
| **Date Entered** | 10-21-2020 2:34 am |
| **Blood Pressure Sitting** | 186/122 |
| **Blood Pressure Standing** | [blank] |
| **Pulse Sitting** | 120 |
| **Pulse Standing** | [blank] |
| **Respiration** | 24 |
| **Temperature** | 97.2 |
| **Weight** | [blank] |
| **SPO2** | 97.0 |
| **Notes** | [blank] |

| | |
|---|---|
| Date of Reading | 10-21-2020 2:34 am |
| Date Entered | 10-21-2020 2:34 am |
| Blood Pressure Sitting | 150/92 |
| Blood Pressure Standing | [blank] |
| Pulse Sitting | 101 |
| Pulse Standing | [blank] |
| Respiration | 20 |
| Temperature | 97.2 |
| Weight | [blank] |
| SPO2 | 97.0 |
| Notes | [blank] |

| | |
|---|---|
| Date of Reading | 10-21-2020 2:34 am |
| Date Entered | 10-21-2020 2:34 am |
| Blood Pressure Sitting | 148/78 |
| Blood Pressure Standing | [blank] |
| Pulse Sitting | 97 |
| Pulse Standing | [blank] |
| Respiration | 20 |
| Temperature | 97.2 |
| Weight | [blank] |
| SPO2 | 97.0 |
| Notes | [blank] |

| | |
|---|---|
| Date of Reading | 10-21-2020 2:34 am |
| Date Entered | 10-21-2020 2:34 am |
| Blood Pressure Sitting | 140/74 |
| Blood Pressure Standing | [blank] |
| Pulse Sitting | 89 |
| Pulse Standing | [blank] |
| Respiration | 19 |
| Temperature | 97.2 |
| Weight | [blank] |
| SPO2 | 97.0 |
| Notes | [blank] |

| | |
|---|---|
| Date of Reading | 10-21-2020 7:39 am |
| Date Entered | 10-21-2020 7:39 am |
| Blood Pressure Sitting | 0/0 |
| Blood Pressure Standing | 170/104 |
| Pulse Sitting | [blank] |
| Pulse Standing | 97 |
| Respiration | [blank] |
| Temperature | [blank] |
| Weight | [blank] |
| SPO2 | [blank] |
| Notes | [blank] |

| | |
|---|---|
| **Date of Reading** | 10-21-2020 1 27 pm |
| **Date Entered** | 10-21-2020 1 27 pm |
| **Blood Pressure Sitting** | 148/94 |
| **Blood Pressure Standing** | [blank] |
| **Pulse Sitting** | 81 |
| **Pulse Standing** | [blank] |
| **Respiration** | 14 |
| **Temperature** | 97.6 |
| **Weight** | [blank] |
| **SPO2** | 99.0 |
| **Notes** | [blank] |

26.   Ramirez requested medical attention related to problems he was having with his blood sugars and symptoms of dangerously High Blood Pressure, Glucose via complaints of feeling sick, pain in his chest, left arm and headache. Ramirez's requests for help and medical attention were made directly to the Detention Officers/jail guards, Defendants "John & Joe Doe", assigned to his cell pod, most importantly on evening of October 20, 2020, and early morning of October 21st. Ramirez's complaints were made directly to John and Joe Doe Detention Officers as they made their "rounds" past his jail cell and via Intercom via Sick call process to the Detention Officer on duty that evening and next morning;

27.   On the evening/night of October 20, 2020, at approximately 9:45 p.m., Ramirez health problems escalated and increased. He complained directly

17

to three (3) Detention Officers/jail guards assigned to his cell pod, on each of their "rounds" and via Intercom to the Detention Officer on Intercom duty, of: "bottoming out", loss of vision, chest pain, *left sided weakness*, headache, inability to physically stand or walk steady due to his left side weakness and losing consciousness twice. Ramirez followed protocol and directly asked the Detention Officers/jail guards, Defendants John and Joe Doe, for immediate medical attention. The Detention Officers on duty ignored and minimized Ramirez's pleas for help, delaying obvious and appropriate medical attention, repeatedly telling Ramirez that they were busy, that there were other inmates to look after, and at one point, via Intercom, responded sarcastically to his requests for a doctor by asking him did he want a peanut butter or jelly sandwich;

26. Based on the nature and character of his verbal complaints and requests for medical treatment, KCDC Detention Officers/jail guards, assigned to Ramirez's cell pod and monitoring the Intercom on the evening/night shift on October 20, 2020, were aware, or should have been aware, with proper training, policy, custom and protocol, of his need for timely adequate medical attention due to "stroke" and/or substantial risk of serious harm to Ramirez. Yet Defendants John & Joe Doe/KCDC Detention Officers on duty making the "rounds" that night and responding to inmate Intercom calls showed deliberate indifference to Ramirez's serious and obvious medical needs by ignoring and delaying him access

to appropriate/urgent medical attention. Ramirez was ignored and medical attention delayed even with KCDC and, later, Turn Key's knowledge of Ramirez's diabetes, insulin dependency, and recorded dangerously high Glucose and Blood Pressure levels;

27. Ramirez was desperate for the Detention Officers/jail guards, assigned to his cell pod and Intercom duty on the evening/night of October 20, 2020, Defendants John and Joe Doe, and later Turn Key employees, to take his urgent medical needs seriously and act in a timely manner to allow him access to adequate medical attention;

28. Detention Officers/jail guards, assigned to his cell pod and Intercom on the night of October 20, 2020, ignored and delayed Ramirez's obvious need for medical attention. In the early morning of October 21, 2020, Ramirez recalls being on the floor of his cell unable to get up. Sometime thereafter a KCDC Detention Officer with rank of Sergeant passed by his cell. Ramirez's vision was impaired, and he could not rise up or walk without assistance at this point due to left side weakness. At this juncture it was approximately three (3) hours since Ramirez began requesting medical attention accompanied by obvious "stroke" symptoms viewed by the Detention Officers on duty that evening and early morning of October 21st. At this juncture, the KCDC Detention Sergeant physically lifted and assisted Ramirez down the hallway to the nurse/medical station. Ramirez was unable to fully use his left side, i.e., left arm and leg to rise from the floor

and ambulate. Up to that point KCDC Detention Officers, Defendants John & Joe Doe, ignored Ramirez's obvious symptoms of a "stroke" that required *timely attention* and showed deliberate indifference to his medical needs by delaying him access to medical personnel capable of evaluating and treating his "stroke" conditions;

29.    Ramirez's evaluation by Jail Turn Key personnel at the KCDC nurse/medical station is memorialized in records as occurring on October 21, 2020, at about 1:15 a.m., approximately 3 ½ (three and a half) hours after his initial complaints of "stroke" symptoms. Callie Gray (Turn Key) recorded that Ramirez complained of chest pain and pain down left arm, and *left sided weakness* (Exhibit Complaint Exhibit 3, <u>right corner</u>, page 12/56 & 13/56, emphasis added below);

| 372280 | Phone Orders - Josephine Otto, APRN | Date and Time | 10/21/2020 0115 | Gray, Callie | 10-21-2020 2:36 am |
| 372280 | Nursing Protocol - Chest Pain/Indigestion | Initial Complaint: | chest pain | Gray, Callie | 10-21-2020 2:34 am |
| | Pain/Indigestion | | | | 2:34 am |
| 372280 | Nursing Protocol - Chest Pain/Indigestion | Where is the pain? | chest and down left arm | Gray, Callie | 10-21-2020 2:34 am |

| 372280 | Nursing Protocol - Chest | Extremities: | left sided weakness | Gray, Callie | 10-21-2020 |
| | Pain/Indigestion | | | | 2:34 am |

30.    In the KCDC nurse/medical station, with the KCDC Detention Sergeant holding Ramirez up in a seat, Callie Gray (Turn Key) phoned Josephine Otoo, APRN (Turn Key) with Ramirez's symptoms. Gray and Otoo (Turn Key) memorialized in their record that Ramirez had history of cardiac disease,

diabetes, pain in chest and down left arm, and *"left side weakness". Further, KCDC records indicate* that the pain started at 1:10 a.m. In addition, on October 21st at 2:34 a.m. Ramirez's *Blood Pressure was entered in the record at 186/122,* a dangerously high level that indicated a hypertension crisis, "stroke" and need for immediate physician attention. However, Otoo only gave an order for Nitroglycerin and call back if needed. KCDC Detention Sergeant, Gray and Otoo failed or refused to treat or address Ramirez's serious medical condition exhibited by his obvious complaints and symptoms of "stroke".  At this juncture, with these documented symptoms of *left side weakness and Blood Pressure* indicating *hypertension crisis and "stroke"*, Ramirez reasonably should have been timely treated for "stroke" and/or, more likely, emergently transported to a hospital emergency room. KCDC recorded Ramirez's pain as starting at 1:10 a.m., thus it was aware time was of the essence to treat Ramirez's symptoms of "stroke". This denial of, or delay in, urgently needed medical attention, treatment and transport to medical care outside of KCDC (hospital emergency room), by KCDC Detention Sergeant, Gray and Otoo (Turn Key), delayed and thus denied Ramirez access to adequate/timely "stroke" treatment. KCDC Detention Sergeant, Gray and Otoo's actions and inactions showed deliberate indifference to Ramirez's serious and obvious medical condition and needs;

31.   Both Gray and Otoo (Turn Key) ignored Ramirez's documented and obvious risk factors of diabetes, insulin dependency, dangerously high Glucose levels, Blood Pressure levels indicating a hypertension crisis with complaints of *left sided weakness* along with chest and left arm pain. Appropriate medical attention for Ramirez was evaluation and treatment for "stroke" with emergency transport to a hospital. KCDC Detention Officer/Sergeant, Gray and Otoo were or should have been aware of the substantial risk of serious harm to Ramirez and both showed deliberate indifference to Ramirez's obvious medical condition;

32.   While Ramirez was still in the Jail medical unit, with Nitroglycerin taken, his chest pain showed some improvement.   But his *left sided weakness continued.* This was an obvious sign that a "stroke" was occurring, along with his still dangerously elevated Blood Pressure. Nevertheless, Ramirez was **sent back to his cell** without needed "stroke" treatment or emergency transport to a hospital (Exhibit Complaint Exhibit 3, right corner, page 13/56, emphasis added below);

| 372280 | Nursing Protocol - Chest | Extremities: | left sided weakness | Gray, Callie | 10-21-2020 |
| | Pain/Indigestion | | | | 2:34 am |

33.   Commonly known American Stroke Association guidelines recommend using the FAST assessment to determine if a patient is having a "CVA" or "stroke". FAST is an acronym for Face Drooping, Arm Weakness, Speech, and Time to Call 9-1-1. Other symptoms could include, sudden numbness, sudden

confusion, sudden trouble seeing, sudden trouble walking, and sudden headache.[1] Ramirez exhibited multiple of these symptoms to Detention Officers/jail guards, KCDC Detention Sergeant assigned to his Cell Pod and via Intercom and to Turn Key personnel, Callie Gray & Josephine Otoo, on the night of October 20 and early morning of October 21, 2020. KCDC own records memorialize Ramirez's complaints of left side pain, left side weakness. Further, Ramirez asserts he could not walk or sit unassisted due to weakness in his left arm and leg, had trouble with his vision, numbness, and headache;

34.   Upon returning to his jail cell, Ramirez **continued to** directly voice complaints, including pain, *weakness in his arm and left sided,* and exhibited physical conditions of "stroke" directly to Detention Officers/jail guards assigned to his cell pod while on their "rounds" at his jail cell and via Intercom into the early morning of October 21st. KCDC records memorialized at 7:23 a.m., on October 21st that Ramirez's Glucose level was 285. (Complaint Exhibit 3, page 52/56.) This was dangerously too high, especially given his complaints, physical symptoms and medical history known to KCDC. His condition remained obvious and time was still of the essence to treat his symptoms of "stroke" with appropriate medical attention;[1]

---

[1] https://www.stroke.org/en/about-stroke/stroke-symptoms

35.     Ramirez was reevaluated in the KCDC nurse/medical station by Kim Stout (Turn Key) at <u>1:27 p.m. on October 21</u>, 2020. In the afternoon of October 21st, Stout (Turn Key) noted for the second time "pt has left sided upper extremity weakness", and further notes a <u>worsening of his condition</u> by "*left arm drawn and contracted…*" (Exhibit Complaint Exhibit 3, <u>right corner</u>, page 16/56, emphasis added below);

| 372280 | Urgent Care Worksheet / On-Call Data Collection Sheet | ADDITIONAL ORDERS | pt has left sided upper extremity weakness, left arm drawn and contracted; eval and treatment | Stout, Kim | 10-21-2020 1:27 pm |
|---|---|---|---|---|---|

36.     Only at that late juncture, after a 15 hour and 42 minute delay from when Ramirez first complained to Detention Officers/jail guards (10/20 @ 9:45 p.m.) and 12 hour and 17 minutes delay after Turn Key documented Ramirez's condition (10/21 @ 1:10 a.m.), did KCDC and Turn Key transport Ramirez to Stillwater Medical - Blackwell, Emergency Room, on the afternoon of October 21, 2020. Even at this point, with Ramirez's "*left arm drawn and contracted*", KCDC staff and Stout (Turn Key) refused or failed to recognize the obvious urgency of Ramirez's condition and transported him to the hospital "non-emergency" (Exhibit Complaint Exhibit 3, <u>right corner</u>, page 16/56, emphasis added below);



| 372280 | Urgent Care Worksheet / On-Call Data Collection Sheet | Orders | Security transport to ER (non-emergency) | Stout, Kim | 10-21-2020 1:27 pm |
|---|---|---|---|---|---|

37.     Upon evaluating Ramirez in the Emergency Room, the hospital physician noted that his symptoms began the night before with a

hypoglycemic episode, chest pain, and *left sided weakness*. Dr. Shuart further noted Ramirez was returned to his cell with *facial droop and left sided weakness*. "The patient was not checked until this afternoon at which time patient continued to have left sided leg weakness and contracture of his left arm." (Exhibit Complaint Exhibit 4, emphasis added);

**History of Present Illness**
HPI comments
This is a 50-year-old white male with a history of coronary artery disease, hypertension, diabetes, schizophrenia, who reports the emergency department complaining of left-sided weakness and left arm contractures. Patient is a in the local prison and had an episode of hypoglycemia last night. Patient was taken to dispensary given nitroglycerin for chest tightness, and fed. Patient had facial droop and left-sided weakness at that time and was returned to his cell. Patient was not checked on until this afternoon at which point he continued to have left-sided leg weakness and contracture of the left arm. Patient's other symptoms had resolved. Patient came into the emergency department 16 hours after the onset of his symptom. Patient denies any aggravating relieving factors. Patient denies trauma.
coded allergy=interact checked:
Coded Allergies:
   No Known Allergies (Verified , 11/15/07)
medications

38.   Ramirez arrived at the ER nearly *sixteen (16) hours after the onset of his "stroke" symptoms*. The Emergency Room diagnosed Ramirez with a cerebral vascular accident ("CVA" or "stroke") and a telemedicine visit with a neurologist was performed. It was determined that Ramirez was *outside the window for stroke intervention* [2] (Exhibit Complaint Exhibit 5)

**History of Present Illness**
History was obtained from a review of the electronic record and discussion with the patient and with the attending physician.

Ramiro Ramirez is a 50 y.o. male with history of hypertension, diabetes, and bipolar disorder admitted with acute LEFT hemiparesis.

Patient was in his usual state of health until ~9:00 PM on 10/20, when he began to feel hot and sweaty. He initially thought he was hypoglycemic, but his blood sugar was reportedly okay.

Shortly thereafter, he developed some chest pain, numbness, and weakness of the LEFT hemibody.

When he awoke the morning of 10/21, his symptoms persisted.

He was later taken to Blackwell ED for further evaluation. He was not a candidate for IV t-PA as he was >4.5 hours from onset of symptoms. He was VAN negative, and thus not a candidate for EVT.

He was transferred to ICVH for further evaluation.

39.    Defendant Detention    Officers,    John    and    Joe    Doe,    Detention Sergeant and Turn    Key medical    staff,    Callie    Gray and Josephine Otoo ignored    Ramirez's obvious    medical condition and need for appropriate medical attention in the form of timely "stroke" treatment.  This delay meant that by the time Ramirez arrived at the hospital Emergency Room it was too late to successfully treat for short and long term debilitating effects of a "stroke".[2] Ramirez's  complaints of chest and left  arm pain, *left sided weakness, inability to ambulate and sit unassisted, vision loss, headache, diabetes and dangerously elevated Blood Pressure, high Glucose level, facial droop,* etc., obviously merited appropriate medical attention for "stroke" and evidenced the substantial risk of serious harm to Ramirez. Further, Ramirez's "stroke" symptoms did not improve and worsened when he was taken back to his cell from the medical unit at KCDC, as evidenced by KCDC's later record of *contraction  to  his  left  upper  extremity  and  hand* (Exhibit  Complaint Exhibit 3, <u>right corner</u>, page 16/56, emphasis added below);



| 3/2280 | Urgent Care Worksheet / On Call Data Collection Sheet | ADDITIONAL ORDERS | pt has left sided upper extremity weakness; left arm drawn and contracted; eval and treatment | Stout, Kim | 10-21-2020 1:27 pm |
|---|---|---|---|---|---|

## A. KCDC's Unconstitutional Health Care Delivery System / Policies & Customs

---

[2] Intravenous therapy is indicated in selected patients with acute ischemic stroke when given in 4.5 hours from onset of symptoms. National Institute of Neurological Disorders and Stroke rt-PA Stroke Study Group.Tissue plasminogen activator for acute ischemic stroke.N Engl J Med. 1995; 333:1581–1587. Hacke W, Kaste M, Bluhmki E, Brozman M, Dávalos A, Guidetti D, Larrue V, Lees KR, Medeghri Z, Machnig T, Schneider D, von Kummer R, Wahlgren N, Toni D; ECASS Investigators. Thrombolysis with alteplase 3 to 4.5 hours after acute ischemic stroke.N Engl J Med. 2008; 359:1317–1329

40.     Paragraphs 1- 39 are incorporated herein by reference;

41.     The treatment of Ramirez described above constitutes deliberate indifference
to his serious medical needs, was conducted in furtherance of, or lack thereof,
and consistent with: a) policies, customs, protocols, and/or practices for which
the KCDC promulgated, created, implemented or possessed responsibility for
its continued operation; and b) policies, customs, and/or practices which Turn
Key developed and/or had responsibility for implementing;

42.     Ramirez had a constitutional or statutory right to adequate medical treatment
for his serious medical needs. *Lance v. Morris,* 985 F.3d 787, 794 (10th Cir.
2021), citing, *Strain v. Regalado,* 977 F.3d 984, 989 (10th Cir. 2020). "The
Eighth Amendment 'imposes a duty on prison officials to provide humane
conditions of confinement, including adequate … medical care …' ". *Snow v.
Board of Co. Comm. Of McClain Co.,* 2014 WL 7335319, *3 (W.D. Okla. 2014),
quoting, *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). KCDC,
Defendant/Detention Officers, John, Joe and Sergeant Doe, Jail Director Don
Jones, Turn Key, Callie Gray and Josephine Otoo acted with deliberate
indifference to Ramirez's obvious and observed serious medical needs when
they ignored his "stroke" symptoms, complaints of pain, left side weakness,
etc., in his jail cell, via Intercom verbal complaints and in the nurse/medical jail
station; and, then delayed adequate medical attention via "stroke" evaluation
and treatment and/or emergency transport to a hospital. "Deliberate
indifference to serious medical needs violates the constitutional requirement."

*Snow* at *3, citing, *Estelle v. Gamble,* 429 U.S. 97, 103 – 105 (1976). After a long delay, once finally seen by a physician in an Emergency Room, Ramirez's condition was diagnosed as "stroke" and further treatment was directed. Further, a lay person would have objectively viewed Ramirez (in his jail cell, via verbal Intercom and at nurse/medical station) and his repeated complaints of *chest pain*, *left side/arm pain*, *loss of vision*, *inability to stand*, *inability to ambulate* and *inability to sit up without assistance*, *left side weakness*, facial droop, high and dangerously high <u>recorded</u> *Glucose and Blood Pressure readings*, along with his history of insulin dependent diabetes, heart attack and stents, with repeated requests for medical attention and a doctor, as sufficiently serious to require adequate medical attention. *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006) and *Clark v. Colbert*, 895 F.3d 11258, 1267 (10th Cir. 2018). A delay in medical treatment is sufficiently serious if it causes substantial harm such as a permanent loss or considerable pain. *Requena v. Roberts,* 893 F.3d 1195, 1216 (10th Cir. 2018), citing, *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001). Ramirez suffered considerable pain and permanent physical disability from the "stroke", and delayed adequate treatment, in the form of facial droop, left side weakness, inability to ambulate, etc., Subjectively, the Defendants' own jail and medical records memorialized they saw and were aware of Ramirez's diabetes, insulin dependency, left side weakness, chest pain and left side/arm pain along with contemporaneously high and dangerously high Glucose and Blood Pressure levels. Despite all

this, Defendants chose to disregard the risk that was objectively and subjectively apparent regarding Ramirez's condition recorded in KCDC records and viewed. Ramirez began his serious complaints of "stroke" symptoms at about 9:45 p.m. on October 20, 2020, but adequate medical attention was delayed until about sixteen (16) hours later when he was non-emergently transported to a hospital. Ramirez was suffering a life-threatening condition. But, a life threatening condition is not required to trigger a constitutional duty to provide adequate medical care. Jail guards act with deliberate indifference by waiting even *two (2) hours* to treat an inmate's complained of shoulder pain even though the pain was not life threatening. *McCowan v. Morales,* 945 F. 3d 1276, 1293-94 (10th Cir. 2019);

43.    Oklahoma statute and Administrative Code, governing jails and detention centers, clearly establish Ramirez's basic right(s) to timely and adequate medical care such that: facilities must *develop* and *implement* written policies and procedures to address and record, at a minimum, an inmate's:

-    current illnesses and health problems including medications and special health requirements;

-    "disposition or referral of prisoners to qualified medical personnel on an emergency basis;" 57 O.S. § 4.1; Okla. Admin. Code, Title 310:670-3-1 ("Basic Standards");

Detention Officers posts must be located and staffed to monitor inmate activity and respond to emergency situations. Okla. Admin. Code, Title 310:670-5-3 ("Supervision of Inmates"). Also, adequate medical care is

required to be provided in the jail facility with written polices and procedures for complete emergency medical and health care services. Upon intake screening, "An inmate's whose screening indicates a significant medical or psychiatric problem, … shall be observed frequently by the staff consistent with the facility's policy and the identified need until the appropriate medical evaluation has been completed." Okla. Admin. Code, Title 310:670-5-8 ("Medical Care and Health Services")

Each facility must have a plan and provide twenty-four (24) hour emergency medical care; and, such plans must include arrangements for:

- "The use of one (1) or more hospital emergency rooms …"

- "The use of an emergency medical vehicle; and"

- "An emergency on-call physician … when the emergency health care facility is not located in a nearby community."

- "An appointment shall be made with a physician … within forty-eight (48) hours of a valid written request *unless more immediate action is dictated by the severity of the current situation*." Okla. Admin. Code, Title 310:670-5-8 ("Medical care and Health Services") (emphasis added)

44.  There are and were systemic deficiencies in the medical health care provided to inmates at the KCDC, including Ramirez. The KCDC has long known of these systemic deficiencies and the substantial risks posed to inmates, like Ramirez, subjectively and objectively, but failed to take reasonable steps to alleviate those deficiencies and risks;

45. KCDC and Defendant Jail Director, Don Jones, have also been aware of problems related to the discipline, supervision, training and interactions of Detention Officer/jail guards with inmates (including inmates of color. Ramirez is of Hispanic decent) since, at least, 2018, via direct knowledge, reporting by news media and investigations by Kay County District Attorney's Office and The American Civil Liberties Union. Don Jones was aware of inmate punishment by Detention Officers via a process known as "crucifixion"; and, a jail supervisor putting rival gang members together in a common area, known as "gladiator school", resulting in a white supremacist gang beating and injuring an African American inmate. Further, KCDC Detention Officer/jail guards were alleged to have severely beaten an inmate while he was in a restraint chair in a holding area;

46. The KCDC retained Turn Key as its medical contractor. Turn Key's corporate leadership was aware of deficiencies in the medical care provided at the KCDC prior to and at the time Turn Key was retained;

47. For a time in recent years, Turn Key was the largest private medical care provider to county jails in Oklahoma. Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County;

48. To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin;

49. Turn Key's contract with the KCDC incentivizes cost-cutting measures in the delivery of medical and mental health care service at KCDC to benefit Turn Key's investors in a manner that deprives inmates at KCDC from receiving adequate medical care;

50. These financial incentives create risks to the health and safety of inmates like Ramirez who have complex and serious medical needs, such as diabetes mellites, hypertension, a previous myocardial infarction with stents, bipolar disease, anxiety depression, schizophrenia and/or stroke;

51. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no, or little, guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs within a correctional setting, including diabetes mellites, hypertension, a previous myocardial infarction with stents, bipolar disease, anxiety, depression, schizophrenia and/or stroke;

52. Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions of KCDC inmates in favor of doing nothing and delaying care, in part, because, upon information and belief, Turn Key fails to provide adequate staffing to perform all the tasks it contracts to provide;

53. These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical and KCDC jail staff in the assessment and care of inmates with complex or serious medical needs;

54. Turn Key's corporate policies, practices and customs as described supra, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ramirez's damages, some of which are referenced below:

   A. In June of 2016 an inmate under the care of Turn Key died after being left in a restraint chair for over 48 hours.

   B. In 2016 an inmate was discovered naked, unconscious, and covered in his own feces after having experienced seizure activity that went untreated and unaddressed.

   C. An inmate in the Creek County Jail, also under the "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints - - over several days -- of breathing problems were disregarded by responsible staff.

   D. In the summer of 2016, an inmate at the Muskogee County Jail became permanently paralyzed after jail staff failed to provide him treatment after repeated complaints of pain in his back and chest. The inmate had developed an aggressive form of cancer in his back that staff refused to treat.

   E. On September 24, 2017, an inmate died in the Tulsa County Jail after Turn Key medical staff provided nonexistent treatment to the inmate for over two weeks despite clear indication of his serious medical condition.

55. Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein;

56. By its design, the Turn Key medical system was destined to fail;

57. Turn Key had a policy, practice or custom of inadequately staffing county jails, including KCDC, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Ramirez, with complex and serious medical needs;

58. This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical conditions, like Ramirez, at substantial risk of harm. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in Constitutional deprivations to Ramirez;

59. Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ramirez;

60. Turn Key's contract with KCDC incentivizes cost-cutting measures in the delivery of medical and mental health care service at the KCDC to benefit Turn Key's investors in a manner that deprives inmates, including Ramirez, at KCDC, from receiving adequate medical care;

61. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at KCDC to avoid off-site medical costs;

62. These financial incentives create risks to the health and safety of inmates like Ramirez who have complex and serious medical needs, such as diabetes,

insulin dependent, hypertension, a previous myocardial infarction with stents, bipolar disorder, anxiety, depression, schizophrenia and/or stroke;

63.   Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical KCDC staff regarding the appropriate standards of care with respect to inmates with diabetes, insulin dependent, hypertension, a previous myocardial infarction with stents, bipolar disorder, anxiety, depression, schizophrenia and/or stroke;

64.   KCDC and Defendant Don Jones (Jail Director) were on notice that the medical care and supervision provided by Turn Key and KCDC staff was wholly inadequate and placed inmates, like Ramirez, at excessive risk of harm. However, the KCDC and Don Jones failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ramirez. Further, during the course of events Ramirez complains of herein, Jones became personally aware of his medical circumstances, the failure and/or delay in provision of adequate medical care and subsequently contacted Ramirez to apologize for not acting to assist or help Ramirez while incarcerated at KCDC;

65.   Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ramirez;

66.    In addition, KCDC has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Ramirez, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates;

### ABSENCE OF FEDERALISM BAR TO *MONELL* CLAIM - TURN KEY

67.    Paragraphs 1-66 are incorporated herein by reference;

68.    The federalism concern that compelled the *Monell* Court to erect a bar against respondeat superior liability for § 1983 claims against municipal entities has no application to Turn Key, a private entity. See e.g., *Shields v. Illinois Dept. of Corrections,* 746 F.3d 782, 795 (7th Cir. 2014) ("[A] new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983.");

## CAUSES OF ACTIONS
FIRST CLAIM FOR RELIEF

**FAILURE TO PROVIDE ADEQUATE MEDICAL CARE IN VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)**

69.    Paragraphs 1-68 are incorporated herein by reference.

### A.  Underlying Violations of Constitutional Rights/Individual Liability

70.    Defendants, as described above, knew there was a strong likelihood that Ramirez was in danger of serious harm;

71.    As described supra, Ramirez had serious and urgent medical issues that were known and obvious to Defendants, Turn Key, KCDC, Jail Director Jones, Callie Gray, Josephine Otoo, John, Joe and Sergeant Doe. It was obvious that

Ramirez needed immediate and urgent evaluation and treatment from a physician for a "CVA", "CVI" or "stroke", but such services were denied, delayed and obstructed;

72. Turn Key and KCDC Detention Officers or jailers, including Jail Director Jones, Callie Gray, Josephine Otoo, John, Joe and Sergeant Doe, disregarded the known, obvious and substantial risks to Ramirez's health and safety;

73. As a direct and proximate result of this deliberate indifference, as described above, Ramirez experienced unnecessary physical pain, "stroke", a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, medical expenses, and disability, temporary and permanent;

74. As a direct and proximate result of Defendants' conduct, Ramirez is entitled to pecuniary and compensatory damages. Ramirez is entitled to damages due to the deprivation of his rights secured by the U.S. Constitution, including punitive damages, all in excess of $75,000.00;

### B. Municipal/"*Monell*" Liability (Against Turn Key) [3]

75. Paragraphs 1-74 are incorporated herein by reference;

---

[3] "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, see Monell [v. New York City Dept. of Social Servs., 436 U.S. 658, 694 (1977), 98S.Ct. 2018], or for an action by an authority with final policy making authority, see Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." Revilla v. Glanz, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a Monell theory of liability, thus he need not establish that Turn Key had final policymaking authority for KCDC.

76.     Turn Key is a "person" for purposes of 42 U.S.C. § 1983; [4]

77.     At all times pertinent hereto, Turn Key was acting under color of State law;

78.     Turn Key has been endowed by KCDC with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations;

79.     Turn Key is charged with implementing and assisting in developing the policies of KCDC with respect to the medical and mental health care of inmates at KCDC and has shared responsibility to adequately train and supervise its employees;

80.     In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at KCDC;

81.     There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ramirez's serious medical needs, health, and safety, and the above-described customs, policies, protocols, and/or practices carried out by Turn Key, supra;

82.     Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ramirez.

---

[4] "Although the Supreme Court's interpretation of § 1983 in Monell applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). See also Smedley v. Corr. Corp. of Am., 175 F. App'x 943, 946 (10th Cir. 2005)

Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ramirez's, serious medical needs;

83. Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein;

84. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ramirez's injuries and damages as alleged herein;

85. Turn Key is also vicariously liable for the deliberate indifference of its employees and agents;

### C. Official Capacity Liability (Against Don Jones)

86. Paragraphs 1-85 are incorporated herein by reference;

87. Aforementioned acts and/or omissions of KCDC and/or Turn Key staff in being deliberately indifferent to Ramirez's health and safety and violating Ramirez's civil rights are causally connected with customs, practices, and policies which KCDC and/or Don Jones (Jail Director), individually and/or in official capacity, promulgated, created, implemented and/or possessed responsibility for;

88. Such policies, customs and/or practices are specifically set forth in above paragraphs, supra;

89. KCDC and/or Defendant Don Jones (Jail Director) through continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known

and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ramirez's, health and safety. Further, during the course of events Ramirez complains of herein, Jones became personally aware of his medical circumstances, the failure and/or delay in provision of adequate medical care and subsequently contacted Ramirez to apologize for not acting to assist or help Ramirez while incarcerated at KCDC;

90. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ramirez suffered injuries and damages as alleged herein, all in excess of $75,000.00;

## SECOND CLAIM FOR RELIEF

### Negligence

As to Defendants Turn Key, Callie Gray and Josephine Otoo;

91. Paragraphs 1-90 are incorporated herein by reference;

92. Turn Key, Callie Gray and Josephine Otoo owed a duty to Ramirez, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment;

93. Turn Key, Callie Gray and Josephine Otoo breached that duty by wholly failing to provide Ramirez with prompt and adequate medical treatment despite repeated requests and obvious need;

94. Turn Key, Callie Gray and Josephine Otoo's breaches of the duty of care include, inter alia: failure to treat Ramirez's serious medical and health condition properly; failure to conduct appropriate medical and health

assessments; failure to create and implement appropriate medical and health treatment plans; failure to promptly evaluate Ramirez's physical health; failure to properly monitor Ramirez's physical health; failure to provide access to medical and health personnel capable of evaluating and treating his serious health needs; and a failure to take precautions to prevent Ramirez from further injury;

95.   As a direct and proximate cause of Turn Key, Callie Gray and Josephine Otoo's negligence, Ramirez experienced physical pain, severe emotional distress, mental anguish, permanent and temporary impairment, disability and the damages alleged herein;

96.   As a direct and proximate cause Defendants' negligence, Ramirez has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, death and other damages in excess of $75,000.00;

97.   Turn Key is vicariously liable for the negligence of its employees and agents, including Callie Gray and Josephine Otoo;

98.   Turn Key is also directly liable for their own negligence.


WHEREFORE, premises considered, Plaintiff, Ramiro Ramirez prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five

Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable against each listed Defendant, individually and jointly.

Respectfully Submitted,

Tim Gilpin OBA #11844
GILPIN LAW OFFICE
1874 S. Boulder
Tulsa, Oklahoma 74119
(918) 583-8900 telephone
(918) 796-5724 fax
timgilpin@gilpinlaw.net
Attorney for Plaintiff, Ramiro Ramirez

and

Dimitrios Panagopoulos, OBA # 33437
Deane & Panagopoulos Law, PLLC
6226 E. 101st St. Ste 100
Tulsa, OK 74137
(918) 796-5729 telephone
(918) 796-5723 fax
dimitrios@dpoklaw.com
Co-Counsel for Plaintiff, Ramiro Ramirez

## **VERIFICATION**

STATE OF OKLAHOMA )
                   ) ss.
COUNTY OF TULSA    )

I, Ramiro Ramirez, of lawful age, being first duly sworn upon his oath, deposes and states that he is a Plaintiff in the above Complaint, that he has read and understands the contents contained in the foregoing Complaint and further states that the same are true and correct to the best of his knowledge.

Ramiro Ramirez                    9-22-21
Ramiro Ramirez                    Date