## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) RAMIRO RAMIREZ, | ) | |
|           **Plaintiff,** | ) | |
| vs. | ) | |
| | ) | |
| (1) KAY COUNTY JUSTICE FACILITIES | ) | |
|   AUTHORITY d/b/a KAY COUNTY | ) | Case No. CIV-21-971-JD |
|   DETENTION CENTER, a public trust, | ) | |
| (2) TURN KEY HEALTH CLINICS, LLC, a | ) | |
|   Domestic Limited Liability Corporation, | ) | |
|   et al. | ) | |
|           **Defendants.** | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS
## [Doc. 40] AND BRIEF IN SUPPORT

---

Tim Gilpin OBA #11844
GILPIN LAW OFFICE
1874 S. Boulder
Tulsa, Oklahoma 74119
(918) 583-8900 telephone
(918) 796-5724 fax
timgilpin@gilpinlaw.net
*Attorney for Plaintiff, Ramiro Ramirez*

and

Dimitrios Panagopoulos, OBA # 33437
Deane & Panagopoulos Law, PLLC
6226 E. 101st St. Ste 100
Tulsa, OK 74137
(918) 796-5729 telephone
(918) 796-5723 fax
dimitrios@dpoklaw.com
*Co-Counsel for Plaintiff, Ramiro Ramirez*

April 27, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

SUMMARY OF CLAIMS ............................................................................................ 1

FACTS RELATED TO DEFENDANTS ........................................................................ 1

ARGUMENT AND AUTHORITIES ............................................................................. 5

   *A.   Ramirez plausibly alleged Defendants' were deliberately indifferent to His serious and obvious medical needs.* ............................................................... 8

   *B.   Ramirez has plausibly alleged Defendants Gray and Otoo were deliberately indifferent to His serious and obvious medical needs.* ............................................... 14

   *C.   Ramirez has sufficiently alleged facts to state a constitutional claim against Turn Key based on a Monell/Municipal Liability theory.* ......................................... 15

   *D.   Defendants are not immune from liability under the Oklahoma Governmental Tort Claims Act.* ................................................................................................... 20

CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Archuleta v. Wagner*, 523 F.3d 1278 (10th Cir. 2008) .................................................. 6

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................................ 7, 18

*Bailey v. Defendants Health Clinics, LLC*, 20-CV-0561-CVE-SH (N.D. Okla. Sep. 17, 2021) ................................................................................................................ 18

*Barrios v. Haskell Cnty Pub. Facilities Auth.*, 2018 OK 90, 432 P.3d 233 .... 20, 21, 23, 24

*Barrios v. Haskell County Public Facilities Authority*, 432 P.3d 233 (Okla. 2018) ......... 23

*Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834 L.Ed.2d 773 (1996) ............................ 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 6, 19

*Bell v. Fur Breeders Agricultural Co-op*, 348 F.3d 1224 (10th Cir. 2003) ...................... 10

*Birdwell v. Glanz*, 790 F.App'x 962 (10th Cir. 2020) ..................................................... 24

*Bond v. Sheriff of Ottawa Cnty.*, 20-CV-545-TCK-CDL (N.D. Okla. Sep. 13, 2021) ...... 18

*Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991) ......................................................... 9

*Bowlds v. Defendants Health*, No. CIV-19-726-SLP (W.D. Okla. Feb. 2, 2021) ............. 18

*Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990) ......................................................... 9

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) ......................................................... 8

*County of Santa Fe v. Pub. Serv. Co.*, 311 F.3d 1031 10th Cir. 2002) ............................ 6

*DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001) ......................................................... 13

*Erickson v. Pardus,* 551 U.S. 89 (2007) ....................................................................... 19

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................. 8, 9, 10

*Freeman v. Glanz*, 2017 WL 2569602 (June 13, 2017). ................................................ 17

*Gooding v. Ketcher*, 838 F. Supp. 2d 1231(N.D. Okla. 2012) ................................... 18, 19

*Graham v. Garfield*, No. CIV-17-0634-SLP (W.D. Okla. Mar. 7, 2019) ....................... 23

*Howards v. McLaughlin*, 634 F.3d 1131(10th Cir. 2011) ................................................. 8

*Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) ...................................................... 12, 13

*In re Shattuck,* 411 B.R. 378 (BAP 10th Cir. 2009) ....................................................... 22

*Jackson v. Birmingham Bd.*, 544 U.S. 167 (2005) .......................................................... 6

*Johnson v. Cannon*, No. CIV 07-294-RAW-SPS (E.D. Okla. July 2, 2009) .............. 15, 16

*Johnson v. City of Shelby*, *Miss.*, 135 S.Ct. 346 (2014) ................................................ 19

*Jojola v. Chavez*, 55 F.3d 488 (10th Cir. 1995) ...................................................................4

*Kauble v. Bd. of Cnty. Comm'rs of the Cnty. of Okla. ex rel. Okla. Cnty. Sheriff's Office*, No. CIV-17-729-D (W.D. Okla. Feb. 15, 2018)............................................................19

*Kermicle v. Day*, 428 F.Supp. 16 (W.D. Okla. 1976). ...............................................11, 12

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)........................................................................................................................18, 19

*Lessman v. McCormick*, 591 F.2d 605 (10th Cir. 1979) ....................................................6

*Lewis v. Wallenstein*, 769 F.2d 1173 (7th Cir. 1985) ........................................................9

*Lucas v. Defendants Health Clinics*, LLC, 20-CV-601-TCK-CDL (N.D. Okla. Dec. 8, 2021)................................................................................................................................18

*Mata v. Saiz* , 427 F.3d 745 (10th Cir. 2005) ................................................................8, 9

*Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001) ...............................................11, 12

*Perkins v. Kansas Department of Corrections*, 165 F.3d 803 (10th Cir. 1999)...............12

*Plunkett v. Armor Corr. Health Servs.*, 18-cv-125-WPJ-JFJ  (N.D. Okla. Mar. 25, 2022) ................................................................................................................................12

*Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033 (10th Cir. 2022) ...................................13

*Revilla v. Glanz*, 8 F. Supp. 3d 1336 (N.D. Okla. 2014)...................................................17

*Sanders v. Creek Cnty. Bd. of Cnty. Comm'rs*, No. 17-CV-492-JHP-FHM (N.D. Okla. July 25, 2018) ...............................................................................................................17

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000...................................................9, 13

*Seals v. Jones*, No. 12-CV-569-JED-TLW (N.D. Okla. Sep. 25, 2013) ...........................19

*Self v. Crum*, 439 F.3d 1227 (10th Cir. 2006) ...................................................................8

*Slocum v. Corporate Express U.S. Inc.*, 446 F.App'x 957 (10th Cir. 2011) ......................6

*Smith v. U.S.*, 561 F.3d 1090 (10th Cir. 2009) ...................................................................6

*Soboroff v. Federal Transfer Center*, 2013 WL 4788614 (W.D. Okla. 2013), *unpublished* ................................................................................................................................16

*Sullins v. American Medical Response of Oklahoma, Inc.*, 2001 OK 20, 23 P.3d 259... 21, 22, 24

*Taylor v. RED Development, LLC,* No. 11–2178–JWL, 2011 WL 3880881 (D.Kan. Aug. 31, 2011)........................................................................................................................18

*Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011) ..........................7, 18

*Waddell v. Bd. of Cnty. Comm'rs of Cleveland Cnty.*, No. CIV-11-1037-D (W.D. Okla. Apr. 15, 2014)................................................................................................................23

*West v. Atkins,* 487 U.S. 42 (1988) ................................................................. 17

*Wirtz v. Regalado*, No. 18-CV-0599-GKF-FHM (N.D. Okla. Mar. 2, 2020) ................... 18

**Statutes**

42 U.S.C. § 1983 ............................................................................. 8, 17, 18, 19

Okla. Stat. tit. 18, § 2003(1) ................................................................. 22

Okla. Stat. tit. 18, § 2004(B)(1) ............................................................. 22

Okla. Stat. tit. 51, § 152(7)(a)(1) ........................................................... 22

Okla. Stat. tit. 51, § 152(7)(b) ............................................................. 2, 20

Okla. Stat. tit. 51, § 152(7)(b)(7) ........................................................... 22

Okla. Stat. tit. 51, § 153(A) ................................................................. 20

Okla. Stat. tit. 51, § 155(25) ............................................................... 20

**Other Authorities**

Black's Law Dictionary,1246 (8th ed. 2004) ..................................................... 22

Heart Disease and Stroke in Oklahoma, https://oklahoma.gov/health/health-promotion/heart-disease-and-stroke.html (last visited Dec. 19, 2021) ..................... 4, 11

https://newsroom.heart.org/news/ambulance-nitroglycerin-patch-to-lower-blood-pressure-did-not-improve-stroke-outcomes (last visited April 22, 2022) ..................... 11

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4548722/ (last visited April 22, 2022) ................................................................................................ 11

https://www.stroke.org/en/about-stroke/stroke-symptoms (last visited on April 25, 2022). ................................................................................................ 4

Oklahoma ABLE Tech, https://www.okabletech.org/employment-services/oklahoma-works-access-for-all/access-for-all-bi-weekly-tip/stroke/ (last visited Dec. 19, 2021)... 4

Stroke Symptoms, https://www.stroke.org/en/about-stroke/stroke-symptoms (last visited April 25, 2022) ....................................................................................... 4

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 10

Fed.R.Civ.P. 56(c) ........................................................................... 10

## SUMMARY OF CLAIMS

The Plaintiff, Ramiro Ramirez ("Ramirez") herein Responds in Opposition to Defendants', Turn Key Health Clinics, LLC ("Turn Key"), Callie Gray ("Gray") and Josephine Otoo ("Otoo"), Joint Motion to Dismiss. [Doc. 40]. Ramirez claims that Turn Key, Gray and Otoo violated his constitutional protections under the Eighth and/or Fourteenth Amendments for their deliberate indifference to his obvious serious medical needs causing him pain and resulting in temporary and permanent physical disability; and, these Defendants are guilty of medical negligence under Oklahoma common law. Defendants claim that Ramirez failed to plead sufficient facts to support his causes and that the Oklahoma Governmental Tort Claims Act ("OGTCA") applies to the negligence cause. Ramirez respectfully disagrees.

## FACTS RELATED TO DEFENDANTS

Turn Key is a domestic for profit limited liability company contracting with correctional institutions, including Defendant Kay County Justice Facilities Authority d/b/a Kay County Detention Center ("KCDC"), to provide health care in those institutions. Am. Compl. Doc. 35 at 3[1], ¶4. Under its contract with KCDC, Turn Key was responsible for providing medical services, supervision and medication to Ramirez while he was in custody of KCDC. *Id*. It was also responsible for devising, reviewing, revision, implementing and having policies, protocols and procedures available on KCDC site that govern the provision of medical and mental health care to inmates at KCDC and for training

---

[1] Throughout this Brief, referenced page numbers refer to the ECF page numbers.

and supervising its employees. *Id. See also* Am. Compl. Doc 35-3 (Turn Key Contract). Turn Key claims that it is not a state agency but is subject to the Oklahoma Governmental Tort Claim Act, alleging that it is not subject to Oklahoma's Open Records Act. Am. Comp. Doc. 36-5. Turn Key, Gray and Otoo claim they are employees of KCDC pursuant to the Governmental Tort Claims Act, Okla. Stat. tit. 51, § 152(7)(b). (OGTCA") Mot. Dismiss Doc. 40 at 24. Ramirez previously attempted to obtain Turn Key's protocols specific to KCDC but was denied. Am. Compl. Doc. 35 at 4, ¶7; Docs. 35-4, 35-5 and 33.

Ramirez was jailed at the KCDC for failure to pay old court fines on October 15, 2020. Am. Compl. at 9, ¶ 19. On October 17, 2020, at about 4:46 p.m., Ramirez was interviewed by Krista Dorscher (KCDC Detention Officer or Turn Key employee) for an "Intake Screening" process. In part, KCDC Intake Screening record noted:

> a. Ramirez reported past heart attack and stents placement in 2016,
> b. No prior stroke,
> c. Ramirez had diabetes and takes insulin for it,
> d. Ramirez appearance was "unremarkable",
> e. Ramirez behavior was "appropriate",
> f. He was "alert",
> g. His breathing was "unremarkable",
> h. His "ease of movement" was "unremarkable",
> i. He received instruction on "facility's Sick Call process",
> j. "He appeared "stable" and was assigned "General Population".

*Id.* at 10, ¶20. Ramirez did not enter KCDC with any stroke symptoms. *Id.* at 11, ¶ 22. On October 20, 2020, at about 9:45 p.m., Ramirez's health problems increased and escalated. *Id.* at 19, ¶27. He complained of "bottoming out," loss of vision, chest pain, left-sided weakness, headache, inability to physically stand or walk steady due to left side weakness/paralysis, losing consciousness twice and facial droop. *Id.* ¶¶ 27, 33-38, 40,

These are commonly known classic stroke symptoms. Am. Compl. at 27, ¶ 37 n.1. The American Stroke Association addresses commonly known stroke symptoms and warning signs with a protocol known as F.A.S.T.:

- Face Drooping;

- Arm Weakness;

- Speech Difficulty;

- Time to call 911

The F.A.S.T. protocol emphasizes that to save a life 9-1-1 should be contacted and further describes symptoms such as:

- Numbness;

- Confusion;

-Trouble Seeing;

- Trouble Walking;

- Severe Headache

Ramirez presented with most of these same symptoms to Gray and Otoo. Yet F.A.S.T. procedures or protocols were not addressed or followed. Am. Compl. at 22 - 25, ¶¶ 32 - 35. In addition, the Oklahoma Department of Corrections ("ODOC") has published Nurse Protocols for "Neurologic Deficit", or stroke, that adopted F.A.S.T. and lists many of the same symptoms Ramirez presented to Gray and Otoo. Am. Compl. Doc. 36-8. ODOC protocols were also not followed. Am. Compl. Doc. 35 at 25, ¶35. These Defendants ignored Ramirez's obvious stroke symptoms that necessitated timely/urgent

stroke medical care pursuant to F.A.S.T. protocols adopted by ODOC and widely published and known to lay persons and medical personnel. Instead, Ramirez received only minimal treatment for chest pain that did not resolve that health issue or treat stroke.

After a delay by prison guards, Ramirez was finally taken to the medical station at about 1:15 a.m. on October 21, 2020, approximately three (3) hours after complaining of stroke symptoms. He had to be assisted in walking there, as he was experiencing left side weakness/paralysis and could not ambulate. He complained of dizziness, vision disturbance, headache, facial droop, general weakness, loss of balance, loss of conscious (altered mental state), weakness or numbness in one arm and chest pain. Am. Comp. Doc. 35 at 21 – 24 ¶¶ 30 - 33. Nurse Gray was on duty when Ramirez arrived at the medical station and observed and documented clear symptoms of stroke, including left side weakness and dangerously high blood pressure of 186/122. *Id.* at 22-23, ¶ 32. Gray did not otherwise treat Ramirez, nor do any other assessment, such as the F.A.S.T., which is part of the protocol for ODOC and recommended by virtually all medical literature, including the American Stroke Association and the Oklahoma Health Department.[2] *Id.* at 25, ¶ 35. Gray called the "physician" on duty, Nurse Practitioner Otoo. *Id.* at 22, ¶ 32. Gray described Ramirez's symptoms to Otoo.  The records do not indicate that Otoo questioned Gray as to whether she performed F.A.S.T., even though that is, or should have reasonably been, the recommended procedure, custom or protocol. Otoo only told Gray to give Ramirez

---

[2] *See* Heart Disease and Stroke in Oklahoma, https://oklahoma.gov/health/health-promotion/heart-disease-and-stroke.html (last visited Dec. 19, 2021); *see also*, Oklahoma ABLE Tech, https://www.okabletech.org/employment-services/oklahoma-works-access-for-all/access-for-all-bi-weekly-tip/stroke/ (last visited Dec. 19, 2021); Stroke Symptoms, https://www.stroke.org/en/about-stroke/stroke-symptoms (last visited April 25, 2022).

nitroglycerin pill(s) and call if needed. *Id.* While still at the medical station, the nitroglycerin provided Ramirez only some chest pain improvement, but did not stop it. Am. Compl. at 24, ¶ 34. Further, it did nothing for Ramirez's obvious stroke symptoms, which continued unabated. *Id.* at 24, ¶34. Gray and Otoo did nothing else for Ramirez, in spite of continued obvious stroke symptoms and *sent him back to his cell. Id.* at 24, ¶ 34. Otoo and Gray did nothing to follow up on Ramirez's obvious stroke symptoms. *Id.* at 24 - 27, ¶¶ 34, 35, 37, 38. At approximately 1:27 p.m. on October 21, 2020, about 12 hours after first seen by Turn Key staff, Ramirez was re-evaluated by Kim Stout and only then transferred to the Stillwater Medical – Blackwell Emergency Room, now almost 16 hours from when he first complained and over 12 hours from when he was first seen by Turn Key personnel. *Id.* at 27 & 28, ¶¶ 38, 39. Ramirez's documented stroke symptoms were now even worse, "left arm drawn and contracted". *Id.* at 27, ¶38. Amazingly, Turn Key still refused to acknowledge the emergency and transported Ramirez on a non-emergency basis. *Id.* at 27-28, ¶ 39. By the time he arrived at the hospital, the Emergency Room physician noted that Ramirez was "outside the window for stroke intervention," as it was over 4 ½ hours since onset of his symptoms. *Id.* at 28, ¶41. Ramirez suffered temporary and permanent disabilities because of the Turn Key Defendants' failure to timely treat obvious stroke symptoms. This failure rises to the level of deliberate indifference by the Defendants. Mot. Dismiss at 8.

## ARGUMENT AND AUTHORITIES

When deciding a Rule 12(b)(6) motion to dismiss, courts are "limited to assessing the legal sufficiency of the allegations contained within the four corners of the

complaint[.]". *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008) (quoting *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995). For Rule 12(b)(6) purposes, the court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009). Contrary to Defendants' assertions, a complaint need not establish a prima facie case in order to survive a motion to dismiss. The evidence needed to establish a prima facie case will be obtained through discovery, and it is improper to require this showing at the pleading stage. A Rule 12(b)(6) motion should not be used to resolve factual disputes or contests regarding the substantive merits of a claim or the applicability of defenses. *County of Santa Fe v. Pub. Serv. Co.*, 311 F.3d 1031, 1035 (10th Cir. 2002). It should also not be used to address credibility or proof issues in a complaint. *Twombly*, 550 U.S. at 556; *Jackson v. Birmingham Bd.*, 544 U.S. 167, 184 (2005); *Slocum v. Corporate Express U.S. Inc.*, 446 Fed. Appx 957, 4 (10th Cir. 2011).

The Amended Complaint sets forth legally sufficient claims for relief. It is not, however, Ramirez's burden to prove his Complaint states a claim. Rather, it is Defendants' burden to demonstrate the Amended Complaint fails to state a claim for relief, and Defendants have not satisfied this burden. *See Lessman v. McCormick*, 591 F.2d 605, 607-08 (10th Cir. 1979).

Defendants argue the Amended Complaint does not contain sufficient factual evidence to support a claim for relief. However, at the motion to dismiss stage, the issue is not whether a plaintiff will ultimately prevail but rather, whether the allegations are plausible. The Amended Complaint herein easily satisfies this standard. To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570.

Accepting that *Ashcroft* instructs courts to utilize judicial experience and common sense when determining whether a complaint states a plausible claim for relief and further recognizing that in the municipal liability context, the court in *Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011) observed "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery," and concluded "***only minimal factual allegations should be required at the motion to dismiss stage***." *Thomas*, 800 F. Supp. 2d at 843-43 (emphasis added). The *Thomas* decision struck the appropriate balance of "requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy." *Id.* at 844. Ramirez's allegations against Defendants easily met this "plausibility" standard; he has sufficiently pled facts, taken as true, required to succeed at the Motion to Dismiss stage.

In Defendants' first Proposition, they claim Ramirez has failed to state a constitutional claim against them. Mot. Dismiss, Doc. 40 at 9. Specifically, Defendants claim Ramirez has failed to allege facts sufficient to show he suffered an underlying constitution deprivation by Defendants. Mot. Dismiss. at 10 ("Plaintiff has failed to plead sufficient facts to establish the subjective component of the deliberate indifference standard as to the Turn Key Defendants.").

### A. Ramirez has plausibly alleged Defendants' personnel were deliberately indifferent to His serious medical needs.

Ramirez's first claim for relief is under 42 U.S.C. § 1983. "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Howards v. McLaughlin*, 634 F.3d 1131, 1139 (10th Cir. 2011). Ramirez must plead, at this Motion to Dismiss stage, sufficient facts to support that Defendants were deliberately indifferent to his serious medical needs, by satisfying both an objective and subjective components. The objective component is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Mata v. Saiz* , 427 F.3d 745, 753 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994).). *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019). Defendants do not dispute that Ramirez has met the objective component. Mot. Dismiss Doc. 40 at 10. They do dispute if he has met the subjective standard.

> To satisfy the subjective component, the plaintiff must show the official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837, 114 S.Ct. 1970. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006) (quotations omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ...." Farmer, 511 U.S. at 842, 114 S.Ct. 1970. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

*Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019). Ramirez has sufficiently pled the subjective component to satisfy his pleading burden.

A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional. *See, e.g.* [*Sealock v. Colorado*, 218 F.3d 1205], 1210 (10th Cir. 2000) (delay of "several hours" in taking inmate with chest pains to hospital violated Eighth Amendment); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) ("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985).

*Mata v. Saiz*, 427 F.3d at 755. As the *Mata* court points out, whether the Defendants actually "had the requisite knowledge of a substantial risk is a question of fact" for the factfinder to determine. *Id.* at 752 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994).). Further, an obvious risk where even a reasonable person would realize the risk, infers that the Defendants also realized it, or should have, especially as trained medical personnel. *Farmer v. Brennan*, 511 U.S. at 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Mata*, 427 F.3d at 755. Ramirez's stroke symptoms were obvious.

Ramirez does not just plead "inadvertent failure to provide adequate medical care," as alleged by Defendants. Mot. Dismiss at 11, 14, 17. Defendants state Ramirez must plead Defendants were subjectively aware of the risk of harm to him and then disregarded such known risk. *Id.* at 12. Defendants allege they did in fact provide Ramirez with treatment in response to his medical complaints, including observing him and administering medication to him to treat his symptoms, and Ramirez merely disagreed with the treatment he was provided; and, at most, this is only a negligent failure to diagnose a stroke. *Id.* at 13, 14,

17, 18. Defendants are improperly using a Rule 12(b)(6) motion to challenge Ramirez's factual allegations and the strength of the evidence supporting his claims. This is not the purpose of a Rule 12(b)(6) motion, which is only to test the legal sufficiency of claims. *See* Fed. R. Civ. P. 12(b)(6).

Further, this is not a question to be answered in a motion to dismiss.[3] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude a prison official knew of a substantial risk from the very fact the risk was obvious." *Farmer* 511 U.S. at 842 (internal citations omitted). Even if this were a question here, Ramirez has adequately pled Defendants knew of the obvious substantial risk to him and failed/delayed appropriate care and/or send him to the hospital until it was too late.

When Ramirez was finally taken to the medical station, Gray observed and documented his stroke symptoms. Am. Compl. at 21-22, ¶ 31. At that point Ramirez had

---

[3] Many of the cases cited by Defendants, including *Farmer*, relate to decisions on Motions for Summary Judgment. The standard for motions to dismiss is different:

> In deciding a motion to dismiss under Rule 12(b)(6), the federal courts generally should not look beyond the confines of the complaint itself. . . a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In contrast, a court bases a summary judgment motion on matters outside the complaint, such as other "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). The Supreme Court, in explaining the difference between the two types of motions, points out that the court must consider the conduct alleged in the complaint in deciding a motion to dismiss, while it must look beyond the pleadings to the evidence before it when deciding a motion for summary judgment. *See Behrens v. Pelletier,*516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (internal quotations and citations omitted).

*Bell v. Fur Breeders Agricultural Co-op*, 348 F.3d 1224, 1230 (10th Cir. 2003).

been exhibiting the stroke symptoms for about 3 hours. *Id.* Gray called Otoo, who, in spite of Ramirez's obvious stroke symptoms, told Gray to only give him nitroglycerine and call if needed. *Id.* at 22-23, ¶ 32. While nitroglycerine is a recommended treatment for angina, Ramirez had classic stroke symptoms, which Gray and Otoo ignored.[4] Ramirez's stroke symptoms continued for over 12 hours after being seen by Turn Key employees. *Id.* at 27 - 28, ¶ 39. Ramirez was finally transported to the hospital but, unbelievably, Turn Key did not dispatch him as an emergency, further delaying his stroke treatment. *Id.* Ramirez was finally treated for stroke over 12 hours after Turn Key employees first documented his stroke symptoms. *Id.* The claim that Gray and Otoo never subjectively believed Ramirez was in imminent danger of harm, is ludicrous. Public Service Announcements, including those from the American Stroke Association, the Oklahoma Dept. of Health, Oklahoma ABLE Tech, including the ODOC Nurse Protocols, belie the statement Gray and Otoo subjectively believed Ramirez was not in imminent danger.[5] If the average lay person knows the symptoms of a stroke and the importance of timely treatment, trained medical personnel are well aware of stroke symptoms and the importance of timely treatment.

Defendants state "[w]here there is no allegation of a total denial of care, but rather plaintiff disagrees with the care provided, the civil rights claim fails. *Kermicle v. Day,* 428

---

[4] Nitroglycerin is used for treatment of angina. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4548722/ (last visited April 22, 2022). *See also* https://newsroom.heart.org/news/ambulance-nitroglycerin-patch-to-lower-blood-pressure-did-not-improve-stroke-outcomes (last visited April 22, 2022).
[5] *See* "Heart Disease and Stroke in Oklahoma," https://oklahoma.gov/health/health-promotion/heart-disease-and-stroke.html (last visited Dec. 19, 2021); *see also,* "Oklahoma ABLE Tech," https://www.okabletech.org/employment-services/oklahoma-works-access-for-all/access-for-all-bi-weekly-tip/stroke/ (last visited Dec. 19, 2021); "Centers for Disease Control and Prevention–About Stroke," https://www.cdc.gov/stroke/signs_symptoms.htm (last visited Dec. 19, 2021).

F.Supp. 16 (10th. Cir. 1976).[6] Whether a medical provider made the right decision concerning a medical diagnosis or treatment is a question of negligence law which does not rise to the level of a constitutional deprivation." Mot. Dismiss at 18. Defendants claim that this is only a disagreement on the care provided, in spite of the fact that ***no timely care for his obvious strokes symptoms was provided***.

> Contrary to Defendants' assertion, providing only some modicum of treatment is not sufficient to absolve themselves from liability for potential deliberate indifference to his serious medical concerns. See Oxendine v. Kaplan, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (rejecting government's argument that it was "dispositive . . . that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care"). Put simply, this case involves more than a mere disagreement with Mr. Plunkett's treatment plan.

*Plunkett v. Armor Corr. Health Servs.*, 18-cv-125-WPJ-JFJ, *11 (N.D. Okla. 3/25/22).

> Defendants argued therein that Oxendine's claim was not truly a constitutionally cognizable claim that delay in receiving qualified medical care caused him substantial harm, but is instead based upon a mere disagreement with Dr. Kaplan regarding the appropriate time at which a specialist should have been brought in to examine Oxendine's reattached finger. The government seems to find dispositive the fact that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care. While it is true that "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation," Perkins,165 F.3d at 811, we do not believe this case involves mere disagreement between the parties. Accord Hunt,199 F.3d at 1223-24 (holding that a prisoner's claim that he was denied adequate and timely medical assistance did not reflect "mere disagreement with his medical treatment," and that "the fact that he has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided").

---

[6] After a thorough search, Plaintiff is unable to find *Kermicle v. Day*, 428 F.Supp. 16 (10th Cir. 1976). Plaintiff did find the case *Kermicle v. Day*, 428 F.Supp. 16 (W.D. Okla. 1976).

*Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001).

> *See Hunt,*199 F.3d at 1224 (stating that officials may be "held liable when [a] delay results in a lifelong handicap or a permanent loss"); *Sealock,* 218 F.3d at 1210 ("The pain and suffering imposed by Barrett's failure to get him treatment lasted several hours. . . . Certainly, not every twinge of pain suffered as a result of delay in medical care is actionable. The evidence in this case, however, establishes the objective element of the deliberate indifference test.").

*Id.* at 1278. As the Court in *Oxidine* pointed out, a delay in providing medical treatment, which has resulted in a lifelong handicap or a permanent loss, establishes deliberate indifference. The Tenth Circuit has very recently reiterated this standard: "An official's state of mind can be inferred from circumstantial evidence. *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). '[I]n some cases a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' Id." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1046 (10th Cir. 2022). The Tenth Circuit further states:

> "However, viewing the evidence in the light most favorable to the plaintiff, as we must, the record reflects that Miller both knew of and disregarded a serious risk to Bowker's health. As we have explained, Bowker's symptoms were so obvious that even a lay person would have recognized his need for medical treatment, even disregarding the discharge instructions of the treating physician." *Id.* at 1046.

> We therefore conclude that the district court erred as a matter of law in concluding that Miller did not violate a clearly established constitutional right. The district court did not consider *Sealock*, *Olsen*, or *McCowan*. Rather, it explained only its view that Miller did not completely deny medical care as did the defendant in *Al-Turki*, because she sent Bowker to the emergency room on three occasions. However, the district court failed to consider the complete denial of medical attention to Bowker's serious symptoms from June 12 until his death on June 30. *Id.* at 1048.

As with the plaintiffs in *Prince* and *Oxidine*, Ramirez's symptoms were obvious, even to a lay person. In spite of some care being given for chest pain, Ramirez's obvious stroke symptoms were ignored and no timely medical treatment was received for stroke,

resulting in temporary and permanent disabilities. Under F.A.S.T. protocols, Ramirez's stroke symptoms dictated that an urgent situation existed and timely treatment was necessary.

At the Motion to Dismiss stage, Ramirez has sufficiently pled that Defendants knew of and disregarded a serious risk to his health or safety.

## B. Ramirez has plausibly alleged Defendants Gray and Otoo were deliberately indifferent to His obvious serious medical needs.

Gray and Otoo make substantially the same argument(s) as Turn Key. Gray alleges that Ramirez admits she did not disregard or ignored his complaints. Mot. Dismiss at 13. However, this is a misstatement of what Ramirez alleged. Ramirez alleges that Gray, while documenting his obvious stroke systems with dangerously high Blood Pressure and Glucose levels, did not initiate the F.A.S.T. protocol, did not provide any necessary treatment for his stroke symptoms, and did not provide emergency transport to a hospital. Am. Compl. at 22-25, ¶¶ 31-35. Otoo argues that she did provide treatment, which provided some improvement. Mot. Dismiss at 16. Again, however, Otoo misstates what Ramirez has alleged. The nitroglycerin pill(s) provided to Ramirez only slightly improved his chest pain, but it did not stop. Am. Compl. at 24, ¶34. Also, nitroglycerin is prescribed for angina, but is not a treatment for stroke symptoms and, in fact, can worsen the stroke symptoms. *See* note 4, *supra.* This both Gray and Otoo should have known, as the symptoms and F.A.S.T. protocol are publicly published, well known and not newly discovered. Both these Defendants made a deliberate choice to ignore the stroke symptoms, and minimally "treat" only chest pain, because it appears this was the easiest and cheapest

treatment, even though it was not the appropriate treatment for Ramirez's symptoms, a course of conduct dictated by their employer Turn Key. Am. Compl. at 35 - 37, ¶¶ 51 - 53.

In fact, both Gray and Defendant Otoo ignored the ODOC Nursing Protocol by failing to do the F.A.S.T. assessment and failing to call 9-1-1. *Id.* at 25, ¶ 35, ("ODOC Nurse Protocol – Neurologic Deficit, a nurse is 'to call EMS for altered state of consciousness, facial drooping and/or can't speak,' and under its Hypertension Protocol (ODOC Nursing Protocol – Hypertension, a nurse is to 'call 911 if altered mental status change.')"). The Nurse Protocols also direct the care provider that the F.A.S.T. assessment be used. *Id.* at 40 - 42, ¶66 ("The Nurse Protocols direct the care provider to observe 'Stroke-Think F.A.S.T.'"). Am. Compl. Doc. 36-2.

Failing to treat Ramirez's serious medical condition, stroke, caused him continued pain and resulted in temporary and permanent disabilities. Both Gray and Otoo chose to ignore Ramirez's obvious stroke symptoms and made the deliberate choice not to provide appropriate care. Ramirez, at the Motion to Dismiss stage, has sufficiently pled that Gray and Otoo were deliberately indifferent to his obvious stroke symptoms.

## C. Ramirez has sufficiently alleged facts to state a constitutional claim against Turn Key based on a Monell/Municipal Liability theory.

Turn Key argues that Ramirez failed to allege sufficient facts to state a constitutional claim against it based on a Municipal liability theory. Mot. Dismiss at 18. Turn Key argues, citing *Johnson v. Cannon*, No. CIV 07-294-RAW-SPS (E.D. Okla. July 2, 2009), that Ramirez must prove that an "established specific policy, procedure, or custom caused the plaintiff to suffer a constitutional deprivation." *Id.* at 19. Again, it is important to note

that the *Johnson* decision, where that plaintiff was *pro se*, is from a Motion for Summary Judgment, which has a significantly different standard. *See* note 3, *supra*. Defendant Turn Key argues that Ramirez has made no "specific allegations of any defective policy, practice, or custom of Turn Key which was the moving force behind his alleged constitutional deprivation." Mot. Dismiss at 20-21. Ramirez disagrees. He pled that Turn Key's corporate leadership was aware of the deficiencies in medical care provided by KCDC. Am. Compl. at 35, ¶ 49. Ramirez alleges that Turn Key implemented policies and practices to reduce the cost of providing medical care. *Id* at 35-42 ¶¶ 51-68. He also alleges that Turn Key's contract with KCDC incentivizes cost-cutting measures. *Id.* at 36, ¶ 52; *see also Id.* Doc. 35-3 (Turn Key Contract, page 2 under "Pharmaceutical," page 3 under "Maximum Liability, and page 5 under "Transportation."). Ramirez adequately pleads how Turn Key's contract incentives create risks to inmates like him, with serious medical needs. *Id.* at 36, ¶ 53. Further, Ramirez pled violations of the applicable ODOC Nurse Protocols and widely published and well known F.A.S.T. protocol. Am. Compl. 36-2, Doc. 35 at 22 – 27, ¶¶32 – 35 & at 26 – 27 ¶37.

Turn Key states, quoting an unpublished opinion from the Western District of Oklahoma, that Ramirez's claims are "too vague and conclusory to state a plausible claim for relief." Mot. Dismiss at 21, citing *Soboroff v. Federal Transfer Center*, 2013 WL 4788614 *3-4 (W.D. Okla. 2013), *unpublished* (Plaintiff did not provide dates or other specific facts concerning the nature of his claim against an unnamed prison physician's assistant and where the plaintiff failed to allege the physician's assistant was aware of a substantial risk of serious harm to the plaintiff.). Ramirez pled substantially more facts,

with more specificity, than in the *Soboroff case.* Thus, *Soboroff* is distinguishable from our case. However, in another case against Turn Key, its reliance on *Soboroff*, was also misplaced. *See Sanders v. Creek Cnty. Bd. of Cnty. Comm'rs*, No. 17-CV-492-JHP-FHM, at *22 (N.D. Okla. July 25, 2018).

> Plaintiff has described the alleged conduct of Turn Key with sufficient specificity to give Turn Key notice of the claims against it. Plaintiff's allegations of misconduct rise above the level of medical malpractice or mere negligence. Therefore, Plaintiff's allegations meet the standard for raising an Eighth or Fourteenth Amendment claim.

*Id.* at *23. The court in *Sanders* determined that the plaintiff had pled sufficiently that the conduct alleged of Turn Key is fairly attributable to the State for purposes of §1983.

> Here, Plaintiff has plausibly averred conduct by Turn Key that is fairly attributable to the State for purposes of §1983. *See Revilla v. Glanz*, <u>8 F. Supp. 3d 1336, 1338</u> (N.D. Okla. 2014) (finding plaintiff plausibly alleged that private healthcare provider under contract with Tulsa County Jail to provide medical care to prisoners was acting under color of state law) (citing *West*, 487 U.S. at 54). Plaintiff alleges that Turn Key had a legal duty to provide medical care when required, and that Turn Key breached this duty to provide Sanders with reasonably adequate medical care, which resulted in a violation of her constitutional rights. (Dkt. 23, ¶¶ 27-28). Plaintiff further alleges Turn Key employees "were contracted by Creek County as agents working in the Creek County Jail to provide medical care to inmates," and that those agents were "acting under the color of state law when [Sanders'] constitutional rights were violated." (*Id.* ¶¶ 6, 33). These allegations suffice to plausibly allege that Turn Key was acting under color of state law in providing medical care to Creek County jail inmates, including Sanders. *See Revilla*, 8 F. Supp. 3d at 1338-39; *Freeman v. Glanz*, 2017 WL 2569602, at *5 (June 13, 2017).

*Sanders* at *24. As in *Sanders*, Ramirez has sufficiently pled that Turn Key was acting under color of state law in providing medical care to KCDC.

Ramirez has also clearly cited to Defendants' customs, practices, procedures, or protocols, or lack thereof, for dealing with health care emergencies, as dangerously deficit.

In addition, Ramirez listed several prior instances showing the negative results of Turn Key's corporate policies, practices and customs. Am. Compl. at 38, ¶57. Further, considering the number of court cases filed against Defendants, in addition to the ones described by Ramirez, it is implausible it was not on fair notice that its policies, practices and customs have resulted in constitutional harm. The results of Defendants' deliberate actions are predictable and obvious.[7]

Even after *Twombly* and *Ashcroft*, courts have applied a lax standard when reviewing municipal liability claims at the motion to dismiss stage. Several District Courts have supported this standard:

> In assessing the pleading standard for municipal liability, the Court agrees with the approach recently taken in *Taylor v. RED Development, LLC,* No. 11–2178–JWL, 2011 WL 3880881 (D.Kan. Aug. 31, 2011), ***wherein the court required more than "boilerplate allegations" of a municipal policy, but did not "deman[d] specific facts that prove the existence of a policy" when a plaintiff would not have access to such information before discovery***. *Id.* at \*3–4. (emphasis added)

*Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1241 (N.D. Okla. 2012) (citing *Thomas*, 800 F.Supp.2d at 842–43 (emphasis added). In *Thomas*, the court articulated the method to reconcile the *Iqbal/Twombly* standard with the Supreme Court's prior rejection of a heightened pleading standard for § 1983 claims against municipalities set out in *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

---

[7] *See, e.g., Bailey v. Defendants Health Clinics*, *LLC*, 20-CV-0561-CVE-SH (N.D. Okla. Sep. 17, 2021); *Bond v. Sheriff of Ottawa Cnty.*, 20-CV-545-TCK-CDL (N.D. Okla. Sep. 13, 2021); *Bowlds v. Defendants Health*, No. CIV-19-726-SLP (W.D. Okla. Feb. 2, 2021); *Lucas v. Defendants Health Clinics*, LLC, 20-CV-601-TCK-CDL (N.D. Okla. Dec. 8, 2021); *Wirtz v. Regalado*, No. 18-CV-0599-GKF-FHM (N.D. Okla. Mar. 2, 2020).

Other courts, including courts within the Tenth Circuit, have followed this commonsense approach to the factual specificity required for municipal liability claims. *See, e.g., Gooding*, 838 F. Supp. 2d at 1241. The Western District has also acknowledged this pleading standard against municipalities. *See Kauble v. Bd. of Cnty. Comm'rs of the Cnty. of Okla. ex rel. Okla. Cnty. Sheriff's Office*, No. CIV-17-729-D, *11 n.3 (W.D. Okla. Feb. 15, 2018) ("A federal court may not apply a standard more stringent than the usual pleading requirements of Rule 8(a) in §1983 cases alleging municipal liability. *Johnson v. City of Shelby, Miss*., 135 S.Ct. 346, 347 (2014)." (citing *Leatherman*, 507 U.S. at 164); *see also Seals v. Jones*, No. 12-CV-569-JED-TLW, *4 (N.D. Okla. Sep. 25, 2013) ("Courts should not impose heightened pleading requirements upon civil rights complaints. *See, e.g., Leatherman,* 507 U.S. at 167-68 (rejecting requirement imposed by some district and circuit courts that a civil rights plaintiff must plead detailed facts with particularity); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (after *Twombly,* the Supreme Court continued to apply notice pleading to a civil rights complaint and did not require any heightened standard). Indeed, the Supreme Court in *Twombly* stated it was *not* "requir[ing] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," to "nudge [the claims] across the line from conceivable to plausible.") *Twombly*, 550 U.S. at 570.

At the Motion to Dismiss stage, without the benefit of discovery and where Ramirez's pleadings must be taken as true, he has adequately pled facts to state a constitutional claim based on *Monell*/Municipal liability and that Turn Key was acting under color of law.

**D. Defendants are not immune from liability under the Oklahoma Governmental Tort Claims Act.**

Defendants allege that they are immune from liability for negligence claims under the Oklahoma Governmental Tort Claims Act. Mot. Dismiss at 24. Defendants identify a footnote as the "holding" in *Barrios v. Haskell Cnty Pub. Facilities Auth.*, 2018 OK 90, 432 P.3d 233. *See* Mot. Dismiss at 25 (Defendants state that "the Court *held* as follows, then quotes footnote 5.). The question before the Court in *Barrios* actually was:

> The Governmental Tort Claims Act renders the State immune from any tort suit arising out of the "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility." Do Sections 7 and 9 of Article II of the Oklahoma Constitution nonetheless allow an inmate to bring a tort claim for denial of medical care?

*Barrios,* 2018 OK 90, ¶ 1. The Court noted that it was required to determine whether a *Bosh* claim could be extended to include other tort claims, "constitutional" torts. *Id.* ¶ 2. The infamous footnote 5 states:

> Generally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25). See 51 O.S.Supp.2015 § 152(7)(b) ("As used in The Governmental Tort Claims Act: . . . 7. 'Employee' means any person who is authorized to act in behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time basis. . . . b. For the purpose of The Governmental Tort Claims Act, the following are employees of this state, regardless of the place in this state where duties as employees are performed: . . . (5) physicians who provide medical care to inmates pursuant to a contract with the Department of Corrections, [and] . . . (7) licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies . . . ."); *id*. §§ 153(A), 155(25). ***We have not been asked whether Turn Key Health, LLC or its staff are "employees"*** under section 152(7)(b), but have assumed they are for purposes of answering the questions certified to us.
>
> *Id.* ¶ 4, n.5. (emphasis added).

The Oklahoma Supreme Court clearly stated that it only made an assumption for the purposes of that opinion. The question of whether that defendant was actually an employee *was not before the court* and the Court did not consider the precedential case, *Sullins v. American Medical Response of Oklahoma, Inc.*, 2001 OK 20, 23 P.3d 259.

As in *Barrios*, the Court in *Sullins* was responding to a certified question: "Whether a private entity, such as AMR, may be cloaked with immunity under the Oklahoma Governmental Tort Claims Act **when acting as an "agency" of a public trust**, such as EMSA?" *Sullins*, 2001 OK 20, ¶ 3, 23 P.3d at 260. (emphasis added). In response, the Supreme Court answered "No." "A private entity is not an "agency" of a public trust under the Governmental Tort Claims Act merely because it contracts with the public trust to provide the services which the public trust is authorized to provide." *Id.* ¶ 23, 23 P.3d at 264. The Court explained:

> Notwithstanding the fact that it may be providing a public service, a private entity such as AMR does not act in the administration of government. It is not charged by law with the responsibility of conducting any public business. It is organized by private citizens pursuant to general corporate laws. It is not controlled by or answerable to the public, but is governed by its own board of directors. Its employees are not governmental employees. Except as it has voluntarily obligated itself by contract, it is not required to provide services or remain in existence. In summary, it possesses all the attributes of a private business enterprise, a non-governmental entity.

*Sullins*, ¶ 20, 23 P.3d at 264. As in *Sullins*, Turn Key contracted with a *public trust,* KCDC, not a state actor. Am. Compl. Doc. 35-1. And, Turn Key operated at KCDC as an independent contractor. Am. Compl. Doc. 35-3. The Court also noted that the OGTCA specifically excludes <u>independent contractors</u>.

Moreover, the GTCA expressly excludes "independent contractors" or "an employee of independent contractors" from the definition of "employee," indicating that the Legislature intended to exclude public contractors from the immunity provisions of the GTCA. Expressions of doubtful meaning will be construed so as to promote harmony in the various provisions of a statute and give practical effect to the intention of the legislature if possible.

*Sullins*, ¶ 22, 23 P.3d 264.  This has not changed.  *See* Okla. Stat. tit. 51, § 152(7)(a)(1) ("Employee also includes: (1) . . . [T]he term does not mean a person or other legal entity while acting in the capacity of an independent contractor or an employee of an independent contractor."). Defendants rely on § 152(7)(b)(7), which includes in the definition of employee "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies."  Turn Key, however, is not a licensed medical professional, but like AMR in *Sullins*, it is a private corporation *contracting with a public trust*.  As another court in the U.S. Western District stated:

> The phrase "licensed medical professionals" is not defined under the GTCA. Considering the plain language of the statute, however, the Moving Defendants are not "licensed medical professionals." Instead, Defendants are each limited liability companies. *See Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 263 (Okla. 2001) (where the language of a statute is clear and unambiguous, no further construction is required or permitted).Under Oklahoma law, a limited liability company is a separate legal entity. Okla. Stat. tit. 18, § 2004(B)(1); *see also* Okla. Stat. tit. 18, § 2003(1). A limited liability company is not a person and cannot obtain a medical license. *Compare* Black's Law Dictionary,1246 (8th ed. 2004) (defining "professional" as a *"person* who belongs to a learned profession") (emphasis added). Indeed, because a limited liability company is not a person, it cannot appear on its own behalf in court. *Compare In re Shattuck,* 411 B.R. 378, 384 (BAP 10th Cir. 2009) (recognizing that a limited liability company is an artificial entity that cannot appear in federal court except through licensed counsel).

*Waddell v. Bd. of Cnty. Comm'rs of Cleveland Cnty.*, No. CIV-11-1037-D, at *5 (W.D. Okla. Apr. 15, 2014). Notably, the Honorable Judge Palk, determined, after the issuance of *Barrios*, that Turn Key had not established that it was a licensed medical provider. *See Graham v. Garfield*, No. CIV-17-0634-SLP *4 (W.D. Okla. Mar. 7, 2019). That court stated:

> Turn Key, however, has not established that it is a licensed medical professional. Rather, Turn Key is a private corporation that contracted to provide medical care to inmates at the GCCJA. Although the phrase, "licensed medical professionals" is not defined in the OGTCA, the Oklahoma Legislature elsewhere has defined the phrase "licensed health care professional" as "a physician and surgeon, podiatrist, osteopath, osteopathic physician and surgeon, physician assistant, nurse, dentist, or pharmacist." Okla. Stat. tit. 63, § 3141.2(1). Each of these "licensed health care professional" is an individual actor, not a corporation or other entity.

*Id.* In addition, the court addressed Turn Key's argument that *Barrios* holds that it is an employee, stating that the Oklahoma Supreme Court in *Barrios* did not find that Turn Key was an employee entitled to tort immunity, "but simply assumed the healthcare contractor was an employee for purposes of answering the certified questions before it." *Id.*

As in *Wadell*, Defendant Turn Key is not a "licensed medical professional," but a limited liability company, and as such it does not fall under the definition in the OGTCA as a "licensed medical professional." Further, Defendants Gray and Otoo do not themselves have contracts with KCDC, they are employees of Turn Key, an independent contractor.

The Tenth Circuit recently addressed whether *Barrios* "held" that a contract medical provider was an employee under the Oklahoma Governmental Tort Claims Act, noted that

it was an undecided question and declined to rule on it.  In *Birdwell v. Glanz*, 790 Fed.

Appx 962 (10th Cir. 2020), the court noted:

> [T]he district court relied on *Barrios v. Haskell County Public Facilities
> Authority*, 432 P.3d 233 (Okla. 2018), a recent opinion by the Oklahoma
> Supreme Court. *Barrios* contains a footnote that assumes without
> deciding that an entity is an "employee" under the
> Oklahoma Governmental Tort Claims Act when agreeing to provide
> medical services for inmates and staff. 432 P.3d at 236 n.5.

*Birdwell*, at 964. The court further stated that the interpretation of "footnote 5" should be

left to Oklahoma courts:

> All that's left is an undecided issue of state law, involving interpretation
> of an assumption stated in a footnote to a recent opinion of the Oklahoma
> Supreme Court. Given the novelty of this issue, we conclude that the
> interest in comity predominates and should have led the district court to
> decline supplemental jurisdiction over the state-law claim against Armor.

*Id.* at 964.  The Tenth Circuit hesitated to interpret or apply the infamous *Barrios* footnote

and noted it was a novel undecided question for the state courts.

Finally, Defendants' Joint Motion attached an Order in *Brothers v. Bd. Cnty. Com.

Of Oklahoma Co., et. al.,* No. CIV-21-418-SLP (W.D. March 30, 2022). Notably, in

*Brothers* Turn Key contracted with Oklahoma County, a state entity. In our case Turn Key

contracted with a *public trust* and OGTCA protection does not extend to a private

corporation when it contracts with a public trust. *Sullins*, 2001 OK 20. *Brothers* is

distinguishable from our facts.

## **CONCLUSION**

Based upon the arguments and authorities above, the Plaintiff, Ramiro Ramirez,

respectfully requests that Defendants' Joint Motion to Dismiss [Doc. 35] be Denied.

Respectfully submitted,

/s      *Tim Gilpin*
Tim Gilpin OBA #11844
GILPIN LAW OFFICE
1874 S. Boulder
Tulsa, Oklahoma 74119
 (918) 583-8900 telephone
 (918) 796-5724 fax
timgilpin@gilpinlaw.net
*Attorney for Plaintiff, Ramiro Ramirez*

and

Dimitrios Panagopoulos, OBA # 33437
Deane & Panagopoulos Law, PLLC
6226 E. 101st St. Ste 100
Tulsa, OK 74137
(918) 796-5729 telephone
(918) 796-5723 fax
dimitrios@dpoklaw.com
*Co-Counsel for Plaintiff, Ramiro Ramirez*

## CERTIFICATE OF MAILING

I certify that on April 27, 2022, I electronically transmitted the above to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Alexandra G. Ah Loy
allie@sweetlawfirm.com

Garrett Molinsky
garrett.molinsky@sweetlawfirm.com

Sean P. Snider
ssnider@johnsonhanan.com

Tara M. Penick
tpenick@johnsonhanan.com

s/      *Tim Gilpin*